The United States Court of Appeals for the Federal Circuit is now open and in session. The state of the United States is on record. Good morning. Please be seated, ladies and gentlemen. We have six cases on our calendar this morning. Three patent cases, two from the PTO, one from a district court, a veterans case, and an employee case, and one from the Court of Federal Claims. The latter two will be submitted on the briefs and not be argued. The first case is Hitachi Medicals v. The Alliance of Rare-Earth Permanent Magnet Industry, 2016, 18, 24, and 25. Mr. Herron. Thank you, Your Honor. Good morning. May it please the Court. My name is Mark Herron, and I represent the appellant Hitachi Metals. I'd like to focus today on two issues, and I do want to make sure before my time expires that I have time to discuss the construction of high-speed flow of gas comprising oxygen because— That will depend on how you measure your time. Yes, Your Honor. Okay. But if you agree with us on that claim, that alone would require reversal of Claim 4 of the 765 patent. But I'd like to start with the obviousness issues involving the combination of Yamamoto's high-speed—I'm sorry, strip-casting method with the other references. And if you agree with us on that, then that would mean that Claims 5 and 6 of the 385 patent and Claims 11 and 12 on the 765 patent require reversal or would be revived. The Board was required to articulate a reason why a person of skill in the art would have pursued the combination of Yamamoto's strip-casting with the methods disclosed in Hasegawa, Ohashi, and Hay. The only non-conclusory statement that the Board gave was a desire to improve the magnet production process disclosed in Hasegawa and Ohashi. The Board said the provision of a lower-cost, more productive process better suited for higher-volume manufacturing. But Hitachi Metal's evidence directly rebutted that stated motivation. Yet the Board just refused to consider it, dismissing it as going only to whether the combination would make, quote, commercial sense. In both Board decisions, the Board noted that the patentee at your side did not seem to dispute the other side's view that there'd be a motivation to go with the rapid-cooling strip-casting method because you would produce a more uniform alloy. Was that an accurate depiction of what you did or did not do for the Board in response to the petitioner's advanced motivation to combine theory of a more uniform alloy? I don't think the Board said that we did not dispute that there would have been a motivation to combine. The Board said that we didn't dispute that the elements were known in the art and that it would have been technologically feasible to combine the elements. I thought they also said a little more, that the other side said one motivation would be to produce a more uniform alloy, and the patentee did not dispute that. I don't think that the Board said that, but the more uniform alloy that the Board cited was a citation to the petitioner's reply brief, and the Alliance had cited only a statement from its expert in deposition. I'm just looking at A11. Yes. The petitioner's contention that strip-casting would result in a more uniform alloy. That's correct. That's what I was getting at. But the Board didn't make a finding that that then would be a reason to combine Yamamoto strip-casting with Hasegawa and Ohashi. Our evidence shows that as a result of the more uniform alloy, a person of scholarly art would not have combined the strip-casting with Hasegawa and Ohashi. The Board just simply refused to even consider our evidence, saying that it goes only to whether the combination makes commercial sense. Can I just say, why is it wrong to view the Board in the following way? Your case for why the two pieces of prior art would not be combined hinged on the assertion that the skilled artisan would know that you'd have a serious yield problem if you did that. So you put on, essentially, the evidence. They would recognize the yield problem. And then at A19 of the Board's opinion, the Board says, petitioner has shown sufficiently that a person of skill in the art would have recognized the results of the combination to be predictable, and included in the parenthetical is a sentence from, I don't know if this is an expert or the reply brief or what, a person of ordinary skill would have known to adjust, not how to adjust, would have known to adjust basic fundamental jet milling settings, which is to say they would have known to adjust the second pulverization step to avoid that problem. Why is that not enough together? Because our evidence, our expert, Dr. Lewis, explained that it is not as simple as just adjusting the jet mill. That whenever you make one of these changes. What is this quote from, exhibit 2011-2? I don't remember. That's from Lee, which is one of the references that we had put in in order to show what the distribution was. Right. So as I understand it, here, this is a quote. It's also at A13. The board quoted the same sentence twice. A person of ordinary skill would have known to adjust basic fundamental jet milling settings to accommodate the uniform particle size and shape distribution of the strip gas alloy. That's from the petitioner's reply brief, which then cites and discusses the Lee reference, which talks about how you want to adjust jet milling parameters to avoid having too many superfine particles. And then the reply brief also quotes Dr. Lewis's deposition testimony in full, in two pages. I think it's something like A21-15 in the JA, about how, yes, Dr. Lewis acknowledges that you would know how to adjust the jet milling parameters in order to change the kinds of desired particle sizes you would want. In the ultimate end powder that's made up of fine particles. So two points to that, Your Honor. First of all, our expert, Dr. Lewis, did not say that simply adjusting the jet mill would solve all the problems. Dr. Lewis, all she said was that you could adjust the jet mill parameters in order to control the amount of superfine particles. But in her declaration, she went on to explain that if you don't adjust the inputs, any time you make one of these changes to the overall process, you have to go back and adjust the inputs. And it's going to change, it's going to degrade the overall, if all you do is just adjust the jet mill settings, her declaration explains, that's going to degrade the quality of the magnet. And that a person with a skill in the art would know that. And the problem is that the board just didn't even consider any of that evidence. Had the board looked at that evidence and said, we're not persuaded, that might be different. That can't be quite right. I mean, at these pages, the board did consider it. It may not have explained enough. And this is putting completely to one side. I agree, quite odd thing the board said about, you know, on Monday we consider the commercial motivation and on Tuesday we don't. That doesn't make any sense. And commercial motivation is a kind of motivation for doing something. But this is independent of that. And I'm not sure why it's not enough. I don't think it is independent, Judge Loyer, because I think that the evidence that I just mentioned that is from Dr. Lewis' declaration is part of the evidence that the board said it would not consider because it goes only to whether the combination makes commercial sense. So I don't think it is. I'm very happy to have you think that, Judge Loyer, that's Judge Toronto. It was Baskin. I'm sorry. I'm very sorry, Your Honors. But, Judge Toronto, I don't think that it is an independent part of it. That is part of the evidence that the board said that they were not going to consider. I'd like to talk about the... I just want to pursue this because this actually, to me, seems pretty critical. What is it? I mean, it seems to me that if only indirectly the board is referring to certain evidence and in order for, and it actually seems to sort of find, they would have known not just how to do it but known to do it, known to do it, and we would have to find that it would be unreasonable, lacking in substantial evidence, for the board to credit this reading of the evidence because other evidence just makes it unreasonable. Well, Dr. Lewis' declaration actually says that it's not as simple as just adjusting the jet no, just turning the dial as the alliance would have you think. Well, this doesn't say it's simple, just they would know to do it. Well, but Dr. Lewis' declaration says that actually there are a lot of different things that would go into... You would have to change the starting inputs for the magnet and that doing so would be beyond the capabilities of an ordinary person of skill in the art. She says that a person of ordinary skill in the art, and this is at 788, she says that a person of ordinary skill in the art would know how to follow the combinations and would know how to basically do it but that in order to then adjust the starting inputs in order to avoid degrading the quality of the magnet, which is what you're doing when your motivation is commercial success, then... Strip casting was a pretty well-known established technique by the time this patent application came around, right? It wasn't some mysterious oddball technique for coming up with an alloy. That's right, but there was no prior reference that had combined strip casting with the other steps that are in the patent and that's part of what our inventors did is make that combination and that's a combination... Strip casting had been used to come up with rare earth powder before? The alliance has not pointed to any prior art reference that combines strip casting with the... There's no 102 reference. That's right. I mean, the board found that hay is, but that's based on an erroneous claim construction. Apart from hay, there's no other reference that does that. So unless you have any other questions, I'll turn to the claim construction argument on claim four. The board construed the claim as being satisfied so long as there's oxygen present in the classifier part of the entire jet melt apparatus, but that cannot be reconciled with the claim language, which the claims have two sub-steps, essentially. There's the fine pulverization and then there's the removal sub-step. The claims say that the removal is performed on the fine powder that results from the fine pulverization. So allowing oxygen in the high-speed flow of gas in the classifier, in the removal sub-step, doesn't make any sense. The high-speed flow of gas, every reference to the high-speed flow of gas in the patent is talking about the jet milling. If you look at figure two of the patent, you can see very clearly what we're talking about. The middle section in figure two is a jet mill apparatus, and it's at 79. It has a part on the left, which is the hopper, where you put in your input materials. It has the part in the middle, and that's the miller, or the pulverizer, and it has the part on the right, which is the classifier. Every reference in the patent to a high-speed flow of gas is to the pulverizer in the middle section, not to the classifier. And so the board's construction of allowing oxygen in the classifier section was erroneous. That's 14, not 18? Exactly. The references to high-speed flow of gas are to 14. The board construed as allowing the high-speed in 18. I'd like to reserve the remainder of the time. We will do that, Mr. Herron, Mr. Bradley. Can we pick up where Mr. Herron left off about claim four and claim three? I know there's something that's really the main event, but I'd like to know, because I was a little troubled by the fact that the specification very, very consistently, the only times it talks about the use of a high-speed flow of gas is in the context of jet milling and not in the context of the classifier. Yes, Your Honor, and may it please the Court. In claim four, it's really a matter of just claim reading in light of the specification. Claim one, just to start at the beginning, talks about a second pulverization step, and that step includes finally pulverizing the alloy and further comprises, as part of this pulverization step, a step of removing certain parts of the powder. Then when we get to claim three, headed on our way to claim four, when we get to claim three, it says in that second pulverization step, the alloy is finally pulverized in a high-speed flow of gas. Right, and so there's ambiguity there. What does it mean to be finally pulverized? Is it referring to the overall fine pulverization step, or is it referring to the action in the first sub-step of the actual fine pulverization that's performed by the jet mill? Perhaps one of the best places to look is in the specification itself, and it says, if we look at A82, column four, in lines 56 through 62, it says right here that before the fine pulverization step is finished, so we're still within the fine pulverization step, before that step is finished, at least part of the R-rich superfine powder is removed. So just like the claim says, you have the broader second pulverization step, which comprises both pulverizing and removal, that's what the claim says, and you look at the specification, and it says right here that before that fine pulverization step is finished, part of the powder is removed. I don't want to belabor the point you have other things to talk about, but do you agree with the other side, that every single time in this specification, where there's a reference to the high-speed flow of gas, it is devoted explicitly in the context of doing the jet milling, and it's not in the context at all of the classifier? I do not entirely agree with that. Then where would be that other example of the usage of the phrase high-speed flow of gas in the specification? I think it hinges on the notion that, as the parties agree, this is all part of the jet milling process, and if we look at figure two that the counsel referred to, figure two shows the jet milling process. Right in the middle, it's element number 14, right? No, figure two is the jet milling process, and it includes both the milling chamber 14 and also that classifying body on the right, 16. That's all part in the specification, the way the claims are written, the way the specification describes. These are all part of the second pulverization step, which has two parts, and then the specification even makes this clear, as I just mentioned, saying that as part of that fine pulverization step, before that step is finished, so while we're still fine pulverizing, at least part of the R-rich powder is removed. That's entirely consistent with the claims. It's consistent with what the board construed, how it construed it. But further, as to claim four, which recites that the gas comprises oxygen, Ohashi would seem to lead away from that because it talks about conducting pulverization in an atmosphere in a non-oxidizing or inert gas, which is not oxygen. The parties addressed this point, and I don't believe it's been re-raised on appeal, but Ohashi teaches pulverizing the extremely fine particles and removing them, just as shown in these claims. And the parties have found, or agreed, and the board found, that all these limitations are satisfied. The issue only is, what do the claims mean here? Under this interpretation that the board provided, which is the correct interpretation, there's no dispute that the limitation is satisfied. So it's just a matter of, what does the claim mean? Once we get that far, if this court affirms that construction, it must affirm because there's no dispute of the disclosure in Ohashi. If this court were to reverse, it needs to remand because there's evidence that was presented that the board never reached, that there is, in fact, in Ohashi, oxygen still remaining in the milling chamber. The board didn't reach that argument. So at best, this court could remand on claim four, but the construction was correct. Where was that argument in your briefing or below to the board? I assume it's in your petition. I have a ‑‑ we can see if this will answer the question. On APPX 53 is where the board addresses the argument and doesn't reach it. I try to find a site to our actual brief, but at the top of 53, that whole first paragraph says that they've considered the patent owner's arguments responding to our argument. The patent owner had argued that some amount of oxygen cannot be entirely removed from that milling chamber, that middle chamber in figure two. That was the dispute to the board as whether, even under their claim construction, whether there's still some oxygen because oxygen is pulled out, but some oxygen remains, and that was the evidence. And so at best, if this court reverses or alters the claim construction for claim four, it would need to remand so that the board could address that evidence that, in fact, there is some oxygen still in that chamber. Claim four just says comprises oxygen. It doesn't say how much. The evidence showed that there's still some in that chamber. Just the board never got there. So counsel, my colleague here said that this court should reverse. That's not correct. It would have to remand in order for the board to make that factual finding in the first instance of what Ohashi discloses. You can move on with the rest of your argument. Thank you, Your Honor. Turning to the other focal point of my colleague's argument, the combination of the Ohashi and Hasegawa references with Yamamoto was nothing special, nothing magic going on here at all. Even in Hitachi's patents, it says that the process is applicable equally to both ingot casting methods and strip casting methods. And if you look at the parent, the 765, there's only one claim there that even says it's strip casting. The rest of them pertain equally to ingot casting, just as the specification says. Now they try to say, oh, a person of skill wouldn't have known to combine this well-known strip casting process with the well-known other steps for manufacturing rare earth metals, even though it was well-known. Hitachi's patent says that it's equally applicable to ingot casting and strip casting. The prior art makes clear... I'm a little confused. A patent can say, we've got this great new idea, never been done before. It's equally applicable to blah, blah, blah. What does that tell us about the prior art? What it tells you is that the basic process that they claimed does not get thrown in a tizzy just because you switch from ingot casting to strip casting. A person of skill in the art, as the board found, would know, you just adjust the parameters. This is nothing tricky or magical. A person of skill in the art knows how to do that. Their claims don't have certain claims focused on this special method when you're employing strip casting and different parameters when you're employing ingot casting. The claims that have been invalidated are equally applicable to both, especially in the 765 patent where all but one claim doesn't limit it to a particular type of casting. It could be strip or ingot. That's where it matters because they recognize, as part of what they thought they invented that turns out they hadn't, that it could be equally applicable to strip casting or ingot casting. It doesn't matter. You just pick the one that works better. Generally, everyone knows strip casting works better. Mark, could you provide any enlightenment on, I think, what Mr. Heron was saying in response to some questions about the passage at A13 and then at A19 about a skilled artisan would know to adjust settings. I know I'm skipping a few words, but would know to adjust settings. He indicated that actually the evidence really doesn't quite say something that simple. Again, I'm summarizing, but I mostly want enlightenment about what you think the record says and what we're supposed to make of that. Yes. The parties both presented evidence. Dr. Lewis, their expert, testified that jet milling parameters could be adjusted to control the amount of superfine particles. A person of skill in the art, as the board found, absolutely knew how to adjust the parameters to make it work. When you have on page… Mr. Heron referred to if you're going to do something downstream in the process, you have to also make some changes upstream in the process. Can you enlighten me about that? To some extent, it's all interrelated. If you use strip casting instead of ingot casting, you have benefits that Yamamoto describes in some way. You have benefits from strip casting, which is why persons of skill in the art would absolutely use strip casting in most circumstances. It produces, for example, a more homogenous particle. When you have a more homogenous particle, you're now ahead of the game. When you move on to the pulverization steps, you're already in a better spot because you're going to end up with a particle size distribution that isn't all over the place because you've started out through strip casting by getting a more homogenous… Their answer to that is if you have a very narrow range and then you need to have a cutoff that says everything this side of the range, you may lose half the product. That would be very bad. Why would you do that? Whereas a wider range, if you just cut off at the same place, you may be eliminating, I don't know, 10% or something, and that's economically a lot. Their argument is essentially what KSR said. KSR said a person of ordinary skill has ordinary creativity. They're not an automaton. They're not going to blindly go in and not adjust their parameters. If you're doing strip casting, as was well known, everyone of skill in the art, as the board found, everyone knows that you're going to have a better starting product and you're going to have better pulverization steps and you can adjust those parameters. Their yield argument suggesting that it would result in half of the product being gone is only in the context of assuming that the person of skill in the art is just a machine or an automaton and doesn't know, as the board found one would know, to adjust the parameters. And so even Dr. Lewis testified that the jet milling parameters could be adjusted. People knew how to do that. Where's that? It's at APPX 788. Is that the board quoting the reply quotes from? I don't recall if this is 788. Yes, sir. This is from her deposition. This was before the board, presented to the board. 788, if you look at question 17, line 17 through 22, I'll just read it for the benefit of the other judges. The question, would a person of ordinary skill at the time of the invention understand that the jet milling parameters could be adjusted to control the amount of superfine particles resulting from the jet milling machine? And her answer was yes. This does get back to, first of all, their own experts supported our position. Can I just say, I realize this is getting into the weeds, but cases like this are often decided at that level. I think Mr. Heron referred to something else from Ms. Lewis in the 2100 range. I didn't get the exact joint appendix number. Do you know what I'm talking about? Can you address to that? I do recall, but also I wasn't sure what he was referring to. I think he was referring to some place in Dr. Lewis' testimony where she said this would be beyond the level of skill to figure out not only something to do with the jet milling parameters, but also in terms of trying to figure out what composition you're even going to start with to make that alloy that's produced by the strip casting method. I don't believe that was what her testimony was, but let me say this part. That is part of their view is they come in and say, oh, but Dr. Lewis said this. The standard of review for this court to apply is whether there's substantial evidence supporting the findings the board did make, the anticipation finding, the findings underlying the obviousness determinations. The fact that if it is a fact, and I'm not sure. I don't think it is what you just described. I don't think that's what Dr. Lewis said, but it doesn't matter anyway because it's not that there can't be some contrary evidence. The question is, is there substantial evidence to support the findings the board did make? Absolutely there is. The person, just like Your Honors pointed out on APPX 13 and 16, the board found and supported by evidence, found that somebody would have known how to make these adjustments and would have known what to do. That's absolutely supported by substantial evidence. So even if Dr. Lewis had said something different, and I don't think she did, it wouldn't matter because it's not whether there's contrary evidence. Is there substantial evidence? Absolutely there is. The board went on at some length describing the benefits of combining Yamamoto's strip casting method in the process. Yamamoto, on its face, says, we're going to cool more uniformly than ingot casting. This results in a better, a more homogenous product. It's going to end up having superior pulverization, superior centerability when you get to that end step. Your opposing counsel also said you will wind up with a degraded magnet because by using the strip casting method, you will end up with at least an intermediate powder, a coarse powder that has much more, I don't know, super rich rare earth content. And then a lot of that is going to get swept away through the polymerization process. And so therefore, you're going to end up with a resulting magnet that's just not as effective. I'm out of time, but may I respond? That goes back to the notion of whether the person doing this is just an automaton blindly importing things without adjusting the parameters or thinking at all about what they're doing, but that's not what the board found. The board found that a person with skill in the art would know how to adjust the frame. You would not, if you employ strip casting, you would end up with a more homogenous material. And if you just blindly proceeded and then still got rid of, say, everything below five microns or two microns, well, now you would be getting rid of more, which is just a trade-off. Maybe you would like to anyway because it helps solve the oxidation problem. But a person with skill in the art would have well known, well, why are we getting rid of so much? Let's just tweak that parameter. Because we have less variation among the parameters, now we know we're in this nice band. So instead of getting rid of all these particles, the benefit of strip casting means now we just adjust that dial so we're getting rid of fewer of the small particles. Thank you, Mr. Bradley. I think we have a point. I'm hearing some voices here. I hope if anyone's responsible for them through any electronic instrument, we'll take care of it. I'll leave. It was actually before court began the reciting of the audio. There was. Thank you, Your Honor. Thank you. Mr. Herron, you have three minutes for rebuttal if you need it. Thank you, Your Honor. To start with the claim construction issue, the column four to which opposing counsel pointed in the spec does not answer the question. Column four simply is talking about the umbrella step of fine pulverization. It's not talking about the specific sub-step of high-speed flow of gas.  Every reference in the patent to high-speed flow of gas is to the jet milling component of the overall jet mill apparatus. The evidence, I do want to direct the court to the evidence that I was referring to from Dr. Lewis' testimony, which is at 971 to 972, where she says in paragraph 94 on 972 that using the strip-cast method in Hasegawa would require a significant amount of experimentation to adjust the composition of the alloy so that the final magnet has superior magnetic properties, and that that would utilize capabilities beyond that of one of typical skill in the art. So we're not arguing that a person of skill in the art wouldn't know that something would need to be adjusted, but Dr. Lewis' explanation was that doing that adjustment would be beyond the capabilities of someone of ordinary skill in the art. What is this document, and where did it come in time in relation to the deposition? This is Dr. Lewis' declaration, and I believe it came before her deposition, but her deposition doesn't rebut this. All her deposition says is that a person of skill in the art would know that the jet milling parameters could be changed. It doesn't say in order to reduce the... It doesn't say what level of skill is required to do it. Exactly. Is there something that explains why it would be beyond the level of skill? I guess she says it would require a significant amount of experimentation. It's not quite saying. Well, I guess she does say beyond that of one of typical skill in the art. That's right. These are complicated processes. I'm sorry, but the deposition question and answer, can you look at that, 788? Would a person of ordinary skill at the time of the invention understand that the parameters could be adjusted to control the amount of superfine particles? Yes. Would a person understand that they could be adjusted? Yes. Somebody smarter than me could do it, but not me. Exactly. To get back to your question, Judge Shin, this is a complicated process. Anytime you change a component of the overall process, it requires adjusting, and this is all in her declaration where she explains that it requires adjustments along the way, and so that is beyond the capability of an ordinary person of skill in the art. But the overall point, Your Honors, is this is evidence that we put before the board. I'm sorry, you're out of time. Just the last question. Is there anything, like a prior art reference, that says something like this, that Dr. Lewis said here in paragraph 94? I don't think there's any prior art reference that says that. But the point, Your Honor, is, and just to conclude, this is evidence that the board should have considered, and it just didn't consider it, and that's why a remand is required to send it back to require the board to consider it when it's making its findings. Thank you, Mr. Herrin. We'll take the case on revisement.